**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**LINWOOD EARL SCOTT,**

     **Plaintiff,**

v.                                                                    Case No. 3:04CV275/RV/EMT

**FLORIDA DEPARTMENT OF CHILDREN
AND FAMILY SERVICES,**

     **Defendant.**

_____

**ORDER**

Plaintiff Linwood Earl Scott brought this action against the Florida Department of Children and Family Services ("DCF"), alleging claims of age and gender discrimination under Title VII of the Civil Rights Act of 1964 [42 U.S.C. § 2000e et seq.] and the Florida Civil Rights Act of 1992 ("FCRA") [Fla. Stat. § 760.01 et seq.] The Defendant has now moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc. 46) Unless otherwise noted, the following facts appear to be undisputed.

**I.    FACTUAL BACKGROUND**

Plaintiff Linwood Earl Scott is a 51 year old black male. Scott worked for the DCF as an Economic Self-Sufficiency Specialist I ("ESSSI")[1] from August of 1997 until August of 2002. Throughout the bulk of his tenure at DCF, Scott worked in the Wages unit at the DCF's "one stop" location on L street, in Pensacola, under the direct

---

[1] Prior to March of 2002, Scott's job title was named Public Assistance Specialist, though all job duties were identical.

*Page 2 of 12*

supervision of Constance Douglas.[2]  By all accounts he was a model employee. The Wages Unit on L street was a close knit group, consisting of a small number of ESSSIs, mostly female. Though Scott was older and of a different gender than most of the other ESSSIs, he never felt discriminated against on this account.

Scott's job at DCF was to determine applicant eligibility for temporary cash assistance under various state anti-poverty programs. To do this, an ESSSI would enter an applicant's personal information, such as information involving employment, debts, and household situation, into the DCF's computer system. The system would then determine whether the applicant was eligible for benefits and, if so, what the mix of benefits might be. Benefits fell into one of two categories. There were limited payments that could be made monthly, and larger lump sum payments for emergency cases. If an applicant received a lump sum payment, he was ineligible to receive temporary monthly assistance until the amount in foregone limited monthly payments equaled the lump sum amount. While an ESSSI had the authority to authorize limited monthly payments on his own initiative, lump sum payments had to be approved by the Wages Coalition and by the Wages Unit supervisor.

In order to log on to the DCF's system, a user must provide a valid "P" number and password. A "P" number is a unique employee identification number assigned to each ESSSI by the DCF. A "P" number is not a password, and is publicly available. In addition to their "P" number, each employee was required to create and maintain his or her own password, which had to be changed every 30 days. Failure to keep one's password confidential was grounds for termination.[3]

Scott usually wrote his password down in a notepad he kept with him at his

---

[2] Scott initially worked at DCF's Palafox street office, and was briefly assigned to the Northside Service Center location before being transferred to L street.

[3] Before starting work at DCF, Scott signed a Security Agreement Form, which stated in part "I understand that it is a security violation to disclose my password or to access the system for my own or for another person's personal use." (Doc. 47, attach. 2, at 32)

*Case No: 3:04cv275/RV/EMT*

desk or in his briefcase. The password was not disguised or coded in the notepad. When a thirty day period had elapsed and the password had expired, Scott would scratch out his old password on and write the new password beneath it. Carolyn Watkins, another ESSSI at the Wages unit, claims that Scott verbally told her his password on one occasion, and that she saw the passwords in his notepad on several occasions. Scott denies this.

DCF policy requires an ESSSI to review and verify an applicant's information in hard copy form before authorizing benefits. Policy also requires an ESSSI to indicate the reason for authorizing benefits on the Case Record Comments ("CLRC") screen. Employees were allowed to let other ESSSIs use their work station computers, but only if they logged out first. In practice, however, it appears that many of these policies were honored in the breach. According to several employees at the Wages unit, it was common for employees to authorize benefits on behalf of other ESSSIs without first checking the hard copy file. ESSSIs would also use each others' computers without first logging in with their own "P" number, as required by DCF policy.

Because cases in the Wages Unit tended to be complicated, Douglas, as supervisor, was in the habit of pairing ESSSIs together. Scott was paired with Cecilia McGraw ("McGraw"), who was the most experienced ESSSI in the Wages Unit. Unbeknownst to Scott and the other employees in the Wages Unit, McGraw had begun to create fraudulent public assistance cases in order to divert benefits for her own personal use. McGraw created the cases by randomly entering social security numbers into the DCF system until she found numbers it would accept. She then created hard copy files for each of the fictional clients, and directed that the benefits in these cases be sent to her home address.

In July of 2002, DCF received notice from the Florida Department of Revenue Child Support Office that it had discovered several public assistance cases originating

in the Wages Unit that were approved for cash assistance without the cooperation of the child support office. DCF officials met with officials from the Revenue office, and then commenced an investigation of the matter, headed by DCF Programs Operations Administrator Jan Blauvelt. On August 1, 2002, McGraw voluntarily resigned her employment with DCF, citing personal reasons. Soon thereafter, DCF's investigation discovered a number of cases with severe irregularities. Among other things, the cases lacked hard copy case files, listed incorrect social security numbers for the applicant's dependant children or absent parents, and had a history of unusually large payouts made repeatedly over a short period of time. The cases had been fraudulently created by McGraw. Some of the payments in each case had been authorized by other ESSSIs, including Scott.[4] According to Blauvelt, Scott's activity in the cases was particularly troublesome because he had authorized several large lump sum payments on cases within a period of a few weeks, which was precluded by the eligibility rules.

     On August 15, Scott met with Douglas, who told him that his "P" number had appeared authorizing several payments in the apparently fraudulent cases, and that he was being transferred to another office in DCF pending an investigation. Scott was told to report to Susan Baker's office. Instead, he went to the office of Mamun Rashied, Deputy District Operation Manager for DCF, to discuss the matter. Rashied is a 59 year old black male, who has worked at the DCF for 25 years. Rashied repeated that Scott's transfer had to do with his "P" number appearing in several of McGraw's cases that were under investigation. According to Rashied, Scott told him at the meeting that "when you work together and you have all of this work to do, sometimes you have to do what you have to do." (Doc. 47, attach. 6, at 11) When questioned about this statement, Scott denied that he had ever shared his password, and denied authorizing benefits in the suspect cases. According to Rashied, Scott did

---

[4] In addition to Scott, the "P" numbers of Constance Douglas, Ann Hepburn, Carolyn Watkins, Lahn Nguyen, Joyce Womack, Shenita Davis, and Pam McKenzie all appeared in the fraudulent cases.

admit that he had made a mistake in allowing his password to get out of his control, but that he could not be held responsible for someone else getting his password. Scott denies making these statements, and claims that he told Rashied that he hadn't inappropriately authorized any payments in the cases.

After the meeting with Rashied, Scott went to Susan Baker's office, as he had been instructed. Scott was visibly upset, and was told to go home. Later that day, Baker called Scott, and told him he was being placed on paid administrative leave pending the conclusion of the investigation.

Scott soon received a letter from Rashied, dated August 16, 2002, stating that DCF intended to dismiss him from his position in the Wages Unit due to his violations of DCF policy. The letter noted that Scott's "P" number had appeared authorizing benefits in several fraudulent cases, and that the authorizations did not include comments in the CLRC screen as required by DCF policy.[5] The letter also repeated the statements allegedly made by Scott to Rashied that he "did not approve these cases and could not be responsible for someone else getting [his] password." (Doc. 47, attach. 2, at 37) The letter concluded that Scott had "either inappropriately approved these cases or allowed [his] password to be accessed by someone else to inappropriately approve these cases," either of which was a violation of DCF policy.

---

[5] Specifically, the letter listed the following cash payments authorized using Scott's "P" number:

| | | | |
|---|---|---|---|
| 1. | August 22, 2001 | $548 | Case No. 1025071891 |
| 2. | September 11, 2001 | $303 | Case No. 1147481113 |
| 3. | September 11, 2001 | $9 | Case No. 1147481113 |
| 4. | September 22, 2001 | $548 | Case No. 1025071891 |
| 5. | October 2, 2001 | $303 | Case No. 1147481113 |
| 6. | January 23, 2002 | $610 | Case No. 1135945985 |
| 7. | April 22, 2002 | $426 | Case No. 1123158797 |
| 8. | May 3, 2002 | $591 | Case No. 1135945985 |
| 9. | May 4, 2002 | $338 | Case No. 1123158797 |
| 10. | May 16, 2002 | $303 | Case No. 1147481113 |
| 11. | May 25, 2002 | $549 | Case No. 1135945985 |
| 12. | May 25, 2002 | $364 | Case No. 1123158797 |
| 13. | June 22, 2002 | $364 | Case No. 1123158797 |
| 14. | June 22, 2002 | $549 | Case No. 1135945985 |

(Doc. 47, attach. 2, at 36-37)

(Doc. 47, attach. 2, at 37)

A pre-termination conference was held by the DCF on August 22, 2002, to determine whether Scott should be fired. Scott attended the conference, as did Rashied; Susan Baker; Katie George, DCF's chief legal counsel; and Nancy Von, a personnel services specialist. At the conference, Scott read from a written statement in which he admitted that McGraw had had opportunities to see him log on at his work station, and that he had authorized benefits in cases for her, sometimes without checking the case hard file. Scott also stated at the hearing that McGraw "got access to my password, it was my fault, I'm the… I can only say it was my fault." (Doc. 47, attach. 2, at 42)

Scott received a notice of dismissal letter from the DCF, dated August 23, 2002, informing him that he was being dismissed from his position as an ESSSI, effective August 27, 2002. The decision to terminate Scott was by made solely by Rashied, and was made after the August 22, 2002, conference. According to Rashied, he decided to fire Scott because "[i]f someone gets your password for six, seven, consecutive months in a row, either you're careless or you've given it to them or you've written it down; somehow you've compromised that password." (Doc. 47, attach. 2, at 24)

To date, no other employee at DCF has been fired or reassigned based on the events surrounding McGraw's fraud. While the "P" numbers of several other employees at the Wages Unit also appeared authorizing benefits in the fraudulent case files, the DCF contends that no action was taken against these employees because Blauvelt's initial investigation of the matter concluded that these authorizations were not made in violation of DCF policies. Rashied contends that he did not conduct a more in-depth investigation because he was told not to interview anyone else by the Florida Department of Law Enforcement, which handled the criminal investigation.[6]

---

[6] McGraw was eventually convicted on felony charges based on her fraud, and is currently incarcerated.

Case No: 3:04cv275/RV/EMT

Scott appealed his dismissal to the Florida Public Employees Relation Commission on September 5, 2002. A hearing was scheduled in the case, but before it could occur, Scott withdrew his appeal. In February of 2003, Tina Custer, a 42 year old female, was assigned to the position Scott had occupied at the time of his termination.

## II.     DISCUSSION

### A.     Summary Judgment Standard

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265, 273 (1986); see also Morisky v. Broward County, 80 F.3d 445, 447 (11th Cir. 1996).

However, summary judgment is improper "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 594 (11th Cir. 1995). An issue of fact is "material" if it might affect the outcome of the case under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202, 211 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. See id.; see also Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538, 552 (1986).

Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact. See Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217

(11th Cir. 2000); Ramsey v. Leath, 706 F.2d 1166, 1170 (11th Cir. 1983). On a summary judgment motion, the record and all reasonable inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party. Whatley v. CNA Ins. Cos., 189 F.3d 1310, 1313 (11th Cir. 1999).

  B. Disparate Treatment

Scott's complaint alleges four claims against the DCF in four separate counts: (1) age discrimination in violation of Title VII; (2) age discrimination in violation of FCRA; (3) gender discrimination in violation of Title VII; and (4) gender discrimination in violation of FCRA. However, in his Response to Defendant's motion for summary judgment, Scott has indicated that he is no longer pursuing his age discrimination claims. Summary judgment on those claims is, therefore, proper.[7] As for the gender counts, while they each allege a separate cause of action, the governing law applicable to each count is the same under both Title VII and FCRA. See Castleberry v. Edward M. Chadbourne, 810 So. 2d 1028 (Fla. 1st DCA 2002) (federal case law dealing with Title VII is applicable in construing the FCRA, which is patterned after Title VII). Scott's gender claims will, therefore, stand or fall together. The Plaintiff does not claim racial discrimination.

The Plaintiff bases his claims on a theory of discriminatory disparate treatment --- that he was treated differently from other female employees. A plaintiff may establish a claim of illegal disparate treatment through either direct or circumstantial evidence. Wilson v. B/E Aerospace, 376 F.3d 1079 (11th Cir. 2004). Direct evidence is "evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." Damon v. Fleming Supermarkets of Florida, 196 F.3d 1354, 1358 (11th Cir. 1999). It is evidence of the

---

[7] Title VII does not prohibit employment discrimination based on age, so that would have had to be dismissed in any event. See 42 U.S.C. § 2000e-2(a) (prohibiting employment discrimination based on "race, color, religion, sex, or national origin.") FCRA, by contrast, does include age as a protected category. See Fla. Stat.§ 760.01(2) ("The general purposes of the Florida Civil Rights Act of 1992 are to secure for all individuals within the state freedom from discrimination because of... age.") Nevertheless, because Scott has chosen not to proceed with this claim, I do not discuss it here. If I were to do so, the analysis would mirror the gender claim and the result identical.
Case No.: 3:04CV275/RV/EMT

sort that, if believed, would prove the existence of discriminatory retaliation without inference or presumption. Burrel v. Board of Trustees of Georgia Military College, 125 F.3d 1390 (11th Cir. 1997). In this case, Scott does not offer any direct evidence in support of his gender discrimination claims, but he relies entirely upon circumstantial evidence.

A plaintiff may establish a disparate treatment claim by circumstantial evidence according to the framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1981). This requires a three-step process. First, Scott must establish a prima facie case of discrimination. Id., at 802. A plaintiff can show a prima facie case of discrimination based on circumstantial evidence if he can show: (1) that he is a member of a protected class; (2) that he was qualified for the position; (3) that he suffered an adverse employment action; and (4) that he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated employee outside his protected class. Maynard v. Board of Regents, 342 F.3d 1281 (11th Cir. 2003).

The burden of demonstrating a prima facie case is not onerous. Holifield v. Reno, 115 F.3d 1555 (11th Cir. 1997). Scott easily meets that burden here. Scott is male, and falls into a protected category based on gender. The DCF does not dispute that he was qualified for his position as an ESSSI, or that he suffered adverse employment action, or that Scott's replacement was a female, and thus outside of his protected class of gender.

Once the plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for its actions. McDonnel, Douglas, supra, 411 U.S. at 802-03. Here, DCF contends that Scott was fired because of his multiple violations of DCF policy. It is undisputed that Scott violated DCF policy in a variety of ways. He allowed other ESSSIs to use his computer while he was logged in under his "P" number; he left his office while logged on at his computer; he authorized cases for other ESSSIs (specifically McGraw)

without checking the case's hard copy file; and he failed to enter comments on the CLRC screen. There are also allegations that Scott showed his password to another DCF employee, and that he negligently failed to keep his password confidential. McGraw's fraud illustrates perfectly the need to maintain and enforce the DCF's security and anti-fraud policies, and there can be no doubt, therefore, that these violations do constitute a legitimate reason for terminating Scott.

When the defendant in a disparate treatment case provides a legitimate reason for its actions, the burden shifts back to the plaintiff, who must then prove that the articulated reason for the defendant's action was pretextual, and that the real motivation for the termination was discriminatory. Id., at 804; St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). Scott may satisfy this burden directly, by showing that a discriminatory reason more than likely motivated Rashied's decision to fire Scott, or indirectly, by showing that the proffered reason for Scott's firing is not worthy of belief. Hall v. Alabama Association of School Boards, 326 F.3d 1157 (11th Cir. 2003).

Scott's chief argument that the DCF's purported reason for firing him was a pretext is that it did not also fire other employees whose "P" numbers appeared in the fraudulent cases. While it is probably true that other DCF employees committed violations similar to those committed by Scott, Scott was the only DCF employee to admit violating DCF policy, and the only one whose payments in McGraw's fictitious cases appeared in a "clustered" pattern clearly violating DCF eligibility guidelines. Even leaving aside any admissions Scott may have made to Rashied at their August 15 meeting, Scott admitted to several violations of DCF policy at his August 22 pre-termination conference. He was "paired" with McGraw, and fourteen fraudulent cash payments, totaly almost $6,000, were improperly authorized using his "P" number. At the pre-termination conference, Scott admitted that he had authorized cases for McGraw without checking the case's hard copy file, and that she had the opportunity to see him log in to his work station. Most importantly, Scott admitted that he had

failed to adequately protect his password, saying, "[McGraw] got access to my password, it was my fault, I'm the… I can only say it was my fault." (Doc. 47, attach. 2, at 42)   A plaintiff cannot prove disparate treatment by showing that other employees have not been disciplined for similar violations because they have not been caught. See Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000); Bogle v. Orange County, 162 F.3d 653, 658-9 (11th Cir. 1998).

Scott argues that since no other DCF employee was interviewed by Rashied or subjected to a pre-termination conference, the incriminating statements made during these events cannot be used to distinguish him from the other DCF employees. Any attempt to do so, he contends, would be bootstrapping, akin to when an employer deliberately handicaps an employee's performance only to cite that lack of performance as a grounds for adverse action. See Stemmons v. Missouri Department of Corrections, 82 F.3d 817 (8th Cir. 1996) (plaintiff was able to show pretext where she was criticized for the way she dressed for an interview, but was not allowed by the defendant to leave early to change clothes). This argument fails in several respects. First, the initial investigation conducted by Jan Blauvelt concluded that every other DCF employee whose "P" number appeared in the fraudulent cases had followed DCF policy when authorizing these payments. Blauvelt also found Scott's authorizations in the cases especially troubling, because they included authorization of large benefits in a case within a short period of each other. A more thorough investigation by the DCF was precluded by the criminal investigation of the Florida Department of Law Enforcement, which eventually resulted in criminal charges and a conviction against McGraw. So even absent Scott's later statements, his situation is simply not comparable to the other DCF employees whose "P" numbers appeared in the fraudulent cases. Further, Scott went to Rashied's office and made the incriminating statements on his own initiative, and not at the request of anyone at the DCF. This interview led directly to the decision to hold a pre-termination conference about the matter, so to the degree that Scott was singled out by these proceedings,

this was his own doing, and not the result of some vendetta against him.[8]

Scott has been unable to produce any evidence that he was dismissed from his job at DCF because of his gender. Scott acknowledges that he never felt discriminated against based on his gender prior to his termination. When asked why he thought his dismissal was due to discrimination, he could only respond that "it may have been speculation but based on the information I can see no other way that I wasn't discriminated against." (Doc. 47, attach. 2, at 31) Employment decisions may seem to be unfair, but only discriminatory actions are precluded by Title VII and FCRA. Scott's own personal speculation about discrimination falls far short of establishing it. "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered… extensive evidence of legitimate, non-discriminatory reasons for its actions." Grigsby v. Reynolds Metals, 821 F.2d 590, 597 (11th Cir. 1987).

### III.   CONCLUSION

For the above reasons, the Defendant's motion for summary judgment (Doc. 46) is GRANTED. The Clerk shall enter judgment accordingly, together with taxable costs.

DONE AND ORDERED this 2nd day of September, 2005.

                                       /s/ *Roger Vinson*
                                       **ROGER VINSON**
                                       **Senior United States District Judge**

---

[8] Scott was the only employee to be reassigned based on his involvement with the fraudulent cases. However, mere reassignment does not constitute adverse employment action unless it involves a serious and material change in the terms, conditions, or privileges of employment. Davis v. Town of Lake Park, 245 F.3d 1232 (11th Cir. 2001).
Case No.: 3:04CV275/RV/EMT